## Franklin Union, No. 4, v. The People.
### Gen. No. 11,639.

## Fred Kitchel v. The People.
### Gen. No. 11,670.

## Charles Smith v. The People.
### Gen. No. 11,671.

## John Mucher v. The People.
### Gen. No. 11,672.

## John Mucher v. The People.
### Gen. No. 11,673.

1.   JURISDICTION—*what not essential to.*   Jurisdiction as between the parties before the court does not depend upon the fact that there are other persons proper or necessary parties who are not before the court; the proceeding may be in this respect irregular but it is not for that reason void.

2.   COMPLAINANT—*when capacity of, to sue, cannot be questioned.* It is too late to first question the right of a complainant to maintain his bill on appeal; the question should be raised by demurrer or by plea in the nature of a plea of abatement if the incapacity does not appear on the face of the bill.

3.   CONTEMPT—*when court has jurisdiction to proceed with prosecution for.*   Where the court clearly has jurisdiction of the subject-matter of the bill of complaint, the fact that the manner of the bringing of the suit may have been irregular does not destroy the right of the court to proceed with the hearing for contempt where such mode of bringing the suit might have been cured by amendment had it been questioned.

4.   CONTEMPT—*corporation can be held guilty of.*   A corporation, notwithstanding it cannot be attached or imprisoned, may be punished for contempt and fined; the only exception being in the case of a municipal corporation.

5.   CONTEMPT—*who may object to disposition of fine paid as punishment for.*   It is strongly indicated in this opinion that the State would be the only party that could question the disposition made by the court of a fine paid as punishment for contempt.

6.   CONTEMPT—*when affidavits presented upon hearing for, cannot be questioned.*   Affidavits presented upon a motion for punishment for contempt should be objected to at the time of presentation and

an objection made at the close of the petitioner's case comes too late.

7. CONTEMPT—*how affidavit presented upon hearing for, should be objected to.* An objection to affidavits presented upon such a hearing should be specific in form.

8. CONTEMPT—*when affidavits presented upon hearing for, competent.* Affidavits presented upon such a hearing are competent where they are made a part of the petition praying that the respondents be charged guilty of contempt and tend to show the character and progress of the conspiracy which is made the *gravamen* of the charge of contempt.

9. CONTEMPT—*when proceeding for, civil.* A proceeding to punish for contempt in violation of a strike injunction is civil and not criminal.

10. PARTIES—*when persons become, though not specifically named in the bill as such.* Where a voluntary association appears in a bill as the complainant but the same is signed and specifically consented to by an endorsement thereon by all the individual members of such association, such individual members will be deemed thereby to have become parties complainant thereto.

11. DECREES—*when presumption of validity of, prevails.* In the absence of a complete record the decrees of courts will be supported by every reasonable intendment and presumption.

12. CONSPIRATORS—*joint liability of.* Where a conspiracy is established, each conspirator becomes responsible for means used and acts done by any conspirator in accomplishing the purpose of the conspiracy.

13. STRIKES—*picketing in connection with, unlawful.* Picketing in connection with a strike, having for its object the compelling of an employer to increase the wages of its striking employes, is unlawful and, where continued in defiance of an injunction, constitutes ground for punishment both of the corporation enjoined, by a fine, and of the individual members thereof by fine or imprisonment.

14. CERTIFICATE OF EVIDENCE—*effect given to recitals of.* The recitals of evidence in the certificate of evidence or bill of exceptions are conclusive upon the reviewing court.

Prosecutions for contempt, etc. Appeals from and error to the Superior Court of Cook County; the Hon. JESSE HOLDOM, Judge, presiding. Heard in the Branch Appellate Court at the March term, 1904. Affirmed. Opinion filed October 6, 1905.

**Statement by the Court.** These appeals are by agreement consolidated with No. 11639, Franklin Union No. 4

v. The People, etc., for the purposes of hearing, the record in No. 11639 being considered in No. 11670, No. 11671, No. 11672 and No. 11673, and only one set of abstracts and brief for the respective parties being filed in the several cases.

The five cases are a writ of error and appeals from decrees of the Superior Court of Cook County punishing the plaintiff in error and appellants for alleged contempt for violations of an injunction issued on the 10th day of October, 1903, upon a bill filed by an association called the Chicago Typothetae, on behalf of its members who joined with it in the bill, against Franklin Union No. 4 and others. The appeals of Smith, Kitchell and Mucher are from decrees sentencing each of the defendants to thirty days imprisonment in the county jail and to pay a fine of $100 each, except in No. 11673, which is an appeal from a decree sentencing John Mucher for another violation of the same injunction to imprisonment in the county jail for thirty days. The writ of error is prosecuted by Franklin Union No. 4 from a decree imposing a fine on the Union of $1,000.

The bill was filed to obtain an injunction against interference with the business of the several complainants by the Franklin Union and its members who had inaugurated a strike and were adopting, as it alleges, violence, intimidation and other forms of interference with and obstruction to the business of the complainants. The bill in its scope and character and the relief prayed for by way of injunction is identical in substance with the case of Christensen v. Kellogg Switchboard & Supply Co., 110 Ill. App., 61. It does not appear to be necessary, therefore, to set out in detail the allegations of the bill and the prayer for relief.

The complainants R. R. Donnelly & Sons Company, W. F. Hall Printing Company, Marsh & Grant Company, Faithorn Printing Company, Rogers & Company, S. D. Childs & Company, Shea Smith & Company, Jefferson Theater Program Company and A. R. Barnes & Company are members of the Chicago Typothetae, a voluntary association organized for the purpose of advancing and improving the

printing and binding business engaged in by them in the City of Chicago, and for the purpose of employing skilled mechanics whose services may be required by its members. A contract had been entered into between the Chicago Typothetae, on behalf of its members, and Franklin Union No. 4, a corporation, on behalf of its members, regulating the hours, wages and terms of employment between the different members of the Typothetae and members of the Franklin Union. On September 27, 1903, the Franklin Union by resolution repudiated this contract and inaugurated a strike against the members of the Typothetae as a means of enforcing its demand for increased wages. Upon the commencement of the strike on October 5, 1903, the Union and its members established a picket system around the place of business of each one of the complainants, and these pickets and those assisting them endeavored to obstruct and tie up the business of the complainants, and to prevent them and their employes from carrying on their work, as a means of enforcing the demand of the Union for higher wages. The evidence shows that in pursuance of this common purpose, working girls returning home from complainants' places of business were pounded into insensibility by the strikers, one girl being assaulted twice. Men were assaulted, and threats, vile language and various forms of intimidation were used to frighten or coerce employes of complainants into leaving their employment. After this state of affairs had continued nearly a week the bill was filed and upon due notice to the defendants the injunction was issued.

By leave of court an amended and supplemental bill was filed November 18, 1903, in which all of the original complainants and C. H. Morgan Company were joined as parties complainant. This was allowed without prejudice to the injunction, which was extended to the amended and supplemental bill.

On October 16, 1903, a petition was filed which was amended and supplemented on October 21, 1903, by a petition charging that appellants Charles Smith, Fred Kitchell and John Mucher on the evening of October 16, 1903, as-

saulted three of the employes of Donnelly & Sons Company while leaving the company's place of business near the corner of Clark and Polk streets, Chicago, and that said Kitchell, Smith and Mucher had since the issuing of the injunction been guilty of picketing and patrolling the streets near to the place of business of the complainant R. R. Donnelly & Sons Company with other evil disposed persons for the purpose of intimidating the employes of the company and preventing them from rendering their services and discharging their duties as employes of said Donnelly & Sons Co. With the petition were filed a number of affidavits as exhibits, stating specifically the acts charged against the three respondents above named. A rule was entered requiring the respondents to show cause why they and each of them should not be punished for contempt of court, and they each filed written verified answers. The answers do not purport to deny any facts alleged in the petition. The answer of respondent Mucher states that he is not a member of Franklin Union and that he did not know of the injunction. The answers of respondents Smith and Kitchell say that they did not know of the injunction.

A hearing was had upon the petition and answers and evidence taken by affidavit and otherwise, and on November 6, 1903, an order was entered finding that each of the respondents with knowledge of the injunction had been guilty of violating it, as shown in the petition and the affidavits filed in support thereof. The order contains specific findings of the acts of each respondent and the times and places. The order directed the issuance of an attachment against each of the then respondents. They appeared the following day and the court entered the orders appealed from.

While these proceedings against Mucher and the other respondents were pending, Mucher, as appears from a second petition filed November 2, 1903, and affidavits filed in support thereof, continued his picketing, threatening and assaulting. A rule to show cause was entered upon him under this second petition. He appeared and answered and a hearing was had, and on November 12, 1903, an order was

entered finding that Mucher and others, with knowledge of the injunction, had violated it, and finding the acts and facts constituting the violation. The matter was then continued from time to time until December 12, 1903, when a final order was entered, reciting the prior proceedings and the judgment of contempt under the prior petition and sentencing Mucher to imprisonment in the county jail for thirty days.

On November 20, 1903, a petition was filed against Franklin Union No. 4 and Charles F. Woerner and John M. Shea, respectively president and secretary of the Union, charging the Union with repeated violations of the injunction and specifying the particular clauses of the injunction which it had violated. It averred that the Union and its officers had maintained a picket system around the premises of each of the complainants, and caused their places of business to be patrolled and watched by a force of pickets daily since the injunction was issued for the purpose of intimidating the employes of complainants and persons seeking employment, and of preventing by intimidation and force the complainants from conducting their business; and that the effect of maintaining this picket system had been to produce disorder in the neighborhood of their business places with the result that numerous assaults had been committed upon complainants' employes and persons seeking employment; that employes and others had been frightened away by the pickets and that the respondents persisted in maintaining their unlawful picket system with knowledge that the assaults were the direct outcome thereof and that they directed, aided and assisted in its maintenance. With the petition were filed a large number of affidavits as exhibits. The petition prayed for a rule requiring the Union to show cause why it should not be punished for violating the injunction and for aiding, abetting and assisting others in its violation. The petition was afterwards dismissed as to Woerner and Shea.

The Union filed a written answer, verified by Woerner, its president, in which it expressly denied most of the allegations of the petition, and claimed that it had always been

obedient to the injunction and had never been a party to any unlawful act, and that it had through its officers ordered and directed and advised its members against any unlawful act, and to conduct themselves in a polite and gentlemanly way.

Upon a hearing of the petition and answer, the court entered an order finding the Union guilty of contempt of court, as charged in the petition, and imposing a fine of $1,000. The order contains findings of continuous violations of the injunction by the Union from the time it was granted and of aiding and abetting others in the violation of it. The judgment imposing the fine directed that unless it was paid within ten days execution should issue, and reserved for determination, until after the fine should be collected, the question of paying the whole or a part of it to the complainants for their damages and expenses therein.

DICKSON & BLOOMINGSTON, for plaintiff in error and appellants.

TENNEY, COFFEEN & HARDING and ALLEN & WESEMANN, for defendants in error; HORACE KENT TENNEY and JAMES H. WILKERSON, of counsel.

MR. PRESIDING JUSTICE SMITH delivered the opinion of the court.

It is contended on behalf of plaintiff in error Franklin Union No. 4 and appellants that the bill does not set up any jurisdictional facts, and for that reason the injunction was void ab initio. In support of this contention it is urged that the bill is brought by the Chicago Typothetae, a voluntary association, for and on behalf of R. R. Donnelly & Sons Company and others, members of the association, and that the association is simply an employment bureau for its members and has no interest otherwise in their business and therefore it could not move the court to action upon the rights of its members.

At the foot of the bill following the verification appears the following: "We the undersigned, members of complainant association, hereto affix our seals and consent and request

that action be brought in court by the filing of the foregoing
bill of complaint." This is signed by the members of the
Chicago Typothetae, for whom and in whose right the bill
was filed and the relief prayed.

If, upon this state of the record, it be conceded for the
purpose of argument that the members of the Chicago Ty-
pothetae who signed the foregoing request did not thereby
become parties to the bill, the court did not fail for that
reason to acquire jurisdiction over the parties who were
served. Jurisdiction as between the parties before the court
does not depend upon the fact that there are other persons
proper or necessary parties, who are not before the court.
The proceeding may be in this respect irregular, but it is not
void. Board of Supervisors v. The Mineral Point R. Co.
et al., 24 Wis., 93; Keyes v. Ellensohn, 82 Hun, 13, affirmed
144 N. Y., 700.

We do not find from the record that appellants or plaintiff
in error in any proper way questioned the capacity of the
Chicago Typothetae to maintain the bill. This should have
been done by demurrer, or plea, in the nature of a plea in
abatement, if the incapacity does not appear on the face of
the bill. It is now too late to raise the question. City of
Chicago v. Cameron, 22 Ill. App., 91; Ada Street M. E.
Church v. Garnsey, 66 Ill., 132.

This is a jurisdictional question. The test of jurisdiction
must be found in the allegations of the bill. Under these
the court had the power to enter upon the inquiry, whether
the pleadings were in every respect formal or otherwise.
Jurisdiction of the subject-matter clearly appeared from the
allegations of the bill. That the alleged defect in the manner
of bringing the suit was one which could be remedied by
amendment cannot be doubted. "What is amendable is not
void." Kruse v. Wilson, 79 Ill., 233; Bassett v. Bratton, 86
Ill., 152; Iroquois Furnace Co. v. Wilkin Mfg. Co., 181 Ill.,
582; Johnson v. Miller, 50 Ill. App., 60.

We think, however, that the firms and corporations who
signed the bill in the manner above indicated were parties
to the bill and were bound and would be bound by the pro-

ceedings as effectually as if they had signed the bill. in the ordinary and more formal way. The bill was filed and the relief was asked for in their behalf, and it was based on their right. Although the form and manner of their. signatures to the bill is unusual, it is in essence and substance their bill signed by them. In addition to this, on November 18, 1903, upon due notice, an amendment to the bill was made in which all the parties who had joined in the written request above quoted, and C. H. Morgan Company, joined as parties complainant. This amendment was made by leave of court without prejudice to the injunction which was extended to cover the amended bill and the new party complainant. Nothing is urged against the sufficiency of the amended bill. Moreover, irregularities and errors in proceedings antecedent to contempt proceedings are not available as a defense to the contempt proceedings, where the court has jurisdiction of the parties and the subject-matter. Christensen v. The People, 114 Ill. App., 40, and cases there cited. Our conclusion therefore is that the injunction was valid, as against all defendants, and others who had notice of it. O'Brien v. The People, Chicago Legal News, Vol. 37, p. 365.

The record does not contain any certificate of evidence in the contempt proceedings against John Mucher, Fred Kitchell and Charles Smith. No question is involved or raised as to the sufficiency of the evidence to warrant the findings of the court as expressed in the orders affecting these respondents. The records in these appeals contain nothing but the petitions, answers and final orders and appeal bonds. The findings of the orders are sufficient. In the absence of a complete record the decrees of the Superior Court will be supported by every reasonable intendment and presumption. King v. King, 215 Ill., 100. No question arises upon the merits of these cases, therefore, which this court is called upon to consider.

It is contended on behalf of plaintiff in error Franklin Union No. 4 that in this state a corporation can only be punished through its officers or those acting in aid of it; and Sercomb v. Catlin, 128 Ill., 556, and Hughson v. The People,

91 Ill. App., 396, are cited as stating the law in this state upon this point.

Sercomb v. Catlin was a proceeding against a business manager of a foreign corporation having a branch office in this state, for refusing to obey an order directing him to dismiss an attachment in favor of the corporation against a firm for whose property and effects the court had appointed a receiver. We think the statement in the opinion in regard to punishing a corporation must be taken to apply to the facts of the case before the court, and as the context clearly shows the statement has reference to the manner of obtaining jurisdiction of the corporation in a proceeding against it. The question now under consideration was not before the court.

In Hughson v. The People, 91 Ill. App., 396, the proceeding was likewise against the officer and not against the corporation. In re Western Marine Fire Ins. Co., 38 Ill., 289, cited in the above case, it is dictinctly held that where a court makes a particular person a depository of its funds such person becomes *pro hac vice* an officer of the court and for failure to obey an order of the court relating to the funds he is guilty of contempt and makes the same rule applicable to a corporation having court funds.

The rule now generally recognized is thus stated in the American & English Encyclopedia of Law, Vol. 7, p. 847: "Formerly it was thought that a corporation could not be held liable for contempt, as, by reason of its impersonal nature, it could not be attached. And there are *dicta* to this effect in some of the late cases. The weight of modern authority, however, is against this doctrine. While a corporation cannot be attached or imprisoned it may nevertheless be guilty of a contempt in disobeying or violating an order or decree of court, as it may be guilty of a tort or crime, and it may be fined therefor, and its property sequestered."

That a corporation may be dealt with and punished for a contempt of court is sustained by abundant authority: Rapalje on Contempts, Secs. 1 and 48; High on Injunctions (3d Ed.), Sec. 1460; U. S. ex rel. Southern Express

Co. v. Memphis & Little Rock R. R. Co., 6 Fed. Rep., 237; Wells Fargo & Co. v. Oregon Ry. & Nav. Co., 19 Fed. Rep., 20; Cook on Corporations, Sec. 15b; Commonwealth v. Proprietors of New Bedford Bridge, 2 Gray, 339; Commonwealth v. Pulaski County Agricultural Assn., 92 Ky., 201. The only exception to the rule is that of a municipal corporation, but its officers may be dealt with for any violation of the orders of court. This exception rests on special grounds. No reason exists in the nature and organization of a private corporation for its exemption from punishment and therefore from the control of the courts. On the contrary every sound reason makes for as full control of a corporation, in so far as it or its property may be reached, as of the individual. Upon its organization it becomes a legal entity, liable for its torts and criminal acts. It may be indicted, fined and stripped of its charter, and incidentally its officers may be imprisoned. It would be monstrous to suppose that the law creates a legal organization, clothing it with powers and rights and affording it protection, which it cannot discipline and control. A corporation is liable for negligence, which is a violation of duty, and we see no reason in common sense or law why it should not be fined for a contempt of court, which is a violation of duty.

The order imposing the fine upon the plaintiff in error Franklin Union No. 4 reserves for determination until after the fine is collected the question of paying the amount or any part thereof to the complainants for their damages and expenses in this case. It is urged by the Franklin Union that this provision of the order absolutely vitiates and nullifies the order because the court exceeded its authority in providing indemnity to the complainants. It is to be observed that the order does not direct that the fine when collected or any part of it shall be paid to the complainants. It simply reserves that question for determination after the fine is collected. When that question arises, if it ever does arise, the question of power in the court to take the suggested action will be presented, and the authorities cited by counsel for plaintiff in error may be in point. We cannot now assume,

42

because of the reservation, that the court will hereafter make an erroneous order with reference to the fine after it is collected. If the fine is collected plaintiff in error will then *ipso facto* cease to have any interest in it, and it is doubtful whether it can object to any disposition of it which the court may make. The state on the one hand, and the complainants on the other, will then be the only parties interested in the disposition of the fund. Further than this we do not deem it necessary to go in passing upon this contention. Any discussion at this time of the power of the court to apply the fine when collected to damages and expenses suffered and paid by complainants would be a consideration of an academic question not presented to the court by this record.

At the time the petition in the contempt proceedings was filed against the Franklin Union there were certain affidavits on file in the original case against the Union, setting forth acts in violation of the injunction. These affidavits are expressly referred to in the petition filed against the Union and are made a part of it. Being a part of the petition, and the facts stated therein being the basis in part of the contempt proceedings, the chancellor heard and considered them. It is claimed on behalf of plaintiff in error that the court erred in receiving these affidavits. With this contention we do not agree. According to the abstract of record filed in these cases the objection to the consideration of these affidavits was not made at the time they were presented to the court, but was made at the close of the petitioners' case. The objection should have been made when the affidavits were presented. Hanford v. Obrecht, 49 Ill., 149.

The objection as it appears in the certificate of evidence reads: "On the hearing of said cause counsel for defendants objected to the reading of affidavits filed in the cause prior to the filing of the petition of November 21, 1903." No particular affidavits are specified. No ground of objection is stated. The objection considering the time it was made and its form was not sufficient. McDonald v. Stark, 176 Ill., 456; C. P. & St. L. Ry. Co. v. Nix, 137 Ill., 141; Mackin v. Haven, 187 Ill., 480. But we think the affidavits

were competent on the broad grounds that they were made a part of the petition and that a conspiracy was alleged to exist. The theory of the bill and the petition is that a conspiracy originated when the Union ordered the strike and continued until the petition was filed; and the affidavits were competent as tending to show the character and progress of the conspiracy during the whole period. State v. McCahill, 72 Iowa, 111; Christensen v. The People, 114 Ill. App., 40.

The principal remaining question for determination is whether the court erred in finding, under the evidence, that plaintiff in error, Franklin Union No. 4, did not show cause in answer to the rule, and in punishing it for violation of the injunction.

The evidence shows that the strike was instituted by Franklin Union No. 4 and conducted by it. At a special meeting of the Union on September 27, 1903, the agreement between the Union and the Chicago Typothetae representing complainants, regulating wages and terms of employment, was repudiated by the Union. It was also resolved by the Union at the same meeting that in case the present demand for higher wages terminates in a strike, no strike benefits be paid for the first week of the strike. A special assessment was also levied which was to continue during the entire strike, until suspended by the Union, those on a strike being excused from payment while they are on a strike, but the assessment was to be enforced as soon as they secured work. It was also voted to engage suitable headquarters on the south and west sides of the city for the purpose of transacting the business of the Union in regard to the strike. A strike committee, a conference committee and a visiting committee were then appointed. The strike commenced October 5, 1903, and pickets were immediately placed around the places of business of the complainants. A regular system of picketing was maintained from the commencement of the strike to the date of filing the petition against the Union. Strike headquarters were established in accordance with the resolution of the Union at No. 14 Custom House Place, in the vicinity of the places of business of complainants. The evi-

dence shows that the Union, plaintiff in error, prepared for, organized and conducted the strike, and furnished the sinews of war, through its special assessment, by which the contest was waged. It also provided itself with a convenient place in the immediate vicinity of the places of business of complainants, from which it could the better direct its picketing and watch the progress of events, and the results of the methods employed. The natural and inevitable consequence of these measures was that a condition of disorder, violence and bloodshed prevailed, which was discreditable alike to the Union and its members. No respect was shown for either age, sex, condition or public authority. Women were knocked down, beaten and almost killed. Employes of complainants were attacked by strikers even when being escorted by the police. In addition to acts of violence, threats, intimidation, attempts to induce employes of complainants to leave the service of their employers, by bribery and otherwise, and other acts in violation of the injunction, are shown by the record. The pickets and picket lines were so placed in and along the streets and alleys and approaches to the places of business of the complainants that complainants' employes were obliged to pass through and along these lines. The evidence shows that the attitude of the pickets was ugly and threatening and well calculated to cause fear in the mind of any ordinary person. The evidence contained in the record is voluminous, and it is quite impossible to discuss it in detail without extending this opinion beyond reasonable limits. The record shows upwards of twenty-five actual assaults upon employes of the complainants, many of them being of a serious nature. The testimony tends to show a large number of instances of threats and intimidations of such employes by those engaged in the strike, that the "visiting committee" of the Union was actively engaged in persecuting and trying to frighten employes of complainants into giving up their positions with complainants; that when members of the Union were brought into court for violations of the injunction in this case they were defended by the attorneys for the Union, and Woerner, president, and Shea, secre-

tary and treasurer of the Union, who disbursed the strike benefits, were present at the hearings. It was proved that in October, 1903, a petition was filed in the original cause against John Mucher, Ed Kitchell and Charles Smith and a rule was entered against them to show cause why they should not be attached for contempt of court for violating the injunction in question, and that they answered and evidence was heard, and that upon all of the various hearings plaintiff in error through its counsel defended them. It appears that the same thing was true upon the hearing of the rule based upon the petition filed on November 2, 1903, against Mucher, Tohill and Lopeth. As a result of those hearings the court found that after the issuance of the injunction, and with knowledge of its issuance, Mucher, Kitchell and Smith had been guilty of violating the injunction and had on October 16, 1903, intercepted and assaulted employes of R. R. Donnelly & Sons Company for the purpose of intimidating and coercing said employes of R. R. Donnelly & Sons Company to leave their employment, and for these offenses punishment was duly imposed upon them by the court. It was also proven that in the proceedings against Mucher, Tohill and Lopeth above referred to they had with others picketed, patrolled and guarded the streets and avenues adjoining the place of business of R. R. Donnelly & Sons Company for the purpose of intimidating, threatening and coercing its employes and persons seeking employment with it, and that they watched, interfered with and intercepted said employes in going from and coming to their work for the purpose of intimidating and coercing them by threats and a display of force to leave the employment of the said complainant. And it was proved that all this was done for the purpose of accomplishing the object of the conspiracy set forth in the original bill of complaint in said cause of Chicago Typothetae et al. v. Franklin Union No. 4 et al., and that for these offenses Mucher, Tohill and Lopeth were convicted and punished by the court.

It further appears that Woerner and Shea stated in court in answer to questions put by the chancellor that plaintiff in

error, Franklin Union No. 4, was continually, after the inauguration of the strike, offering money to the employes of the complainants for the purpose of inducing them to quit said employment and to compel the employers to accede to the demands of the Union and its members to take the members of the Union back into the employment of said complainants at a higher scale of wages, and for that purpose the Union was paying what was called strike benefits of $5 a week to girls and other employes of said complainants. In answer to questions put by the court Woerner stated that there were about 1,800 members of Franklin Union No. 4, and that about 200 were out on said strike and that the members not out on strike were contributing two dollars each per week to the Union for the purpose of maintaining the fund out of which said strike benefits were paid.

The evidence of Shea, secretary and treasurer of the Union, shows that no record of the disbursements of money during the strike was kept.

The expressed object of the strike inaugurated by plaintiff in error was to enforce its demand and that of its members for higher wages and to compel each one of the complainants to make individual agreements with Franklin Union therefor. This is stated in the resolutions adopted by the Union on September 27, 1903. In paragraph eight of these resolutions it was ordered "that suitable headquarters be engaged on the South and West sides for the purpose of transacting the business of the strike." Thus the plaintiff in error, Franklin Union, not only inaugurated the strike but assumed direction of it, and for the immediate direction and management of it appointed the committees named in the resolutions. And further, in order to furnish the funds with which to carry on the contest, the Union levied "a special assessment of $2.00 a week, the same to continue during the entire strike until suspended by act of the Union, and to be levied on the entire membership who are employed." Thereupon strike headquarters were established in the vicinity of the places of business of complainants by the Union, and

from these headquarters the strike was directed and picket lines were established and strike benefits were disbursed.

The question is, does the evidence in the case connect the Union with the conspiracy to injure the business of the complainants and terrify their employes and thereby to force the complainants to comply with the demands of the Union as charged in the bill, and with either knowledge of or acquiescence in any of the acts proven which constitute a violation of the injunction?

The general rules by which the evidence briefly referred to above, and other evidence in the case, must be weighed are clear and well established. The evidence clearly established the conspiracy for the illegal purpose charged in the bill and in the petition for a rule to show cause against the Franklin Union. A conspiracy once established, each conspirator becomes responsible for means used and acts done by any conspirator in accomplishing the purpose of the conspiracy. State v. McCahill, 30 N. W. Rep., 553; Lasher v. Littell, 202 Ill., 551. The rule with reference to the parties to a conspiracy is expressed in United States v. Cassidy, 67 Fed. Rep., 698, as follows: "Where an unlawful end is sought to be effected and two or more persons actuated with a common purpose in accomplishing that end work together in any way in furtherance of the unlawful scheme, every one of said persons becomes a member of the conspiracy, although the part anyone was to take therein was a subordinate one. * * * Anyone who, after a conspiracy is formed, and who knows of its existence, joins therein, becomes as much a party thereto at the time as if he had originally conspired. Where several persons are proved to have combined together for the same illegal purpose, any act by any one of them in pursuance of the original concerted plan and with reference to the common object is, in the contemplation of the law, the act of the whole party, and therefore the proof of such act will be evidence against any of the others who are engaged in the conspiracy."

This court in Christensen v. The People, 114 Ill. App., 40, gave an exhaustive review of the law as to conspiracy

and the evidence necessary to establish it. After citing and reviewing many authorities in this state and in other jurisdictions it was said: "Other authorities might be cited, but we know of no well-considered case, or indeed of any case, holding that a combination of persons to injure the business of another is not unlawful. That the appellants and others associated with them acted in concert in unlawfully endeavoring to injure, and in fact injuring complainant's business for an unlawful purpose is fully sustained by the evidence. They conspired, breathed together, to effect the unlawful purpose, and by overt acts did all they possibly could to that end. It is not necessary to prove an express agreement between the appellants and those associated with them. It may be proved by circumstantial evidence. Spies et al. v. The People, 122 Ill., 1, 213; Patnode v. Westenhaver, 114 Wis., 460. In United States v. Weber, 114 Fed. R., 950-953, the court say: 'But if the object of the Union is illegal, or if the methods employed by it, either to induce acquisitions to its ranks or to accomplish its ulterior purposes, are illegal, it appears to be well settled that the persons who combine in such efforts are conspirators,' citing cases. The language quoted is cited with approval in *Ex parte* Richards, 117 Fed. R., 658-668. In Doremus v. Hennessy, 176 Ill., 608-614, the court say: 'No persons, individually or by combination, have the right to directly or indirectly interfere with or disturb another in his lawful business or occupation, or to threaten to do so, for the sake of compelling him to do some act which in his judgment his own interest does not require.' "

Applying these principles to the evidence, and taking all the circumstances together there is no room for reasonable doubt that the Union was a party to the conspiracy charged in the bill and that the picketing was established and continued under the direction of plaintiff in error through its officers and strike committees. No other conclusion of fact upon this point under the evidence could be entertained for a moment by any sane and unprejudiced mind. The evidence sustains this conclusion by a probative force producing a

moral certainty. The picket system once established, the intimidation, assaults, slugging and bloodshed followed as naturally and inevitably as night follows day. There can be no such thing as peaceful, "polite and gentlemanly" picketing, any more· than there can be chaste "polite and gentlemanly" vulgarity, or peaceful mobbing or lawful lynching. As counsel for plaintiff in error says in his brief: "In·these days of industrial strife the non-union man acts on the union man as the red rag on the violent bull, and the average union man apparently needs no incentive by way of direction or authority, from his fellows, so bitter has the feeling become, to promptly endeavor to exterminate the 'scab' at sight." Certainly then, if the union man has a union behind him and a picket line supporting him he will "promptly endeavor to exterminate the 'scab' at sight." This is as well known to the public as it is to counsel. Consequently the mere fact of a picket system being established by men known to be unfriendly constitutes and is a threat of physical violence and an intimidation to the peaceful man. Some men can be intimidated only by being knocked down, but most peaceful law-abiding men can be and are intimidated by an array of unfriendly men who are known to be so brutal and depraved that they not only assault men, but even women and girls. The peaceful and law-abiding man or woman is, entitled to come to and go from his or her work through the public streets of a civilized community in peace and quiet without even a mental disturbance as to his or her perfect safety.

It is idle to talk of picketing for lawful persuasive purposes. Men do not form picket lines for the purpose of conversation and lawful persuasion. Such picketing as is established by the evidence in the case at bar is intended to annoy and intimidate, whether physical violence is resorted to or not, and is unlawful in either case. Courts should be practical. When they form an opinion from evidence it must be a practical one. They should touch earth at every step. They have no opportunity, no license for star-gazing or for indulging in poetic fancy. In imagination and in theory a peaceful picket line may be possible, but in fact a picket line

is never peaceful. It is always a formation of actual warfare and quite inconsistent with everything not related to force and violence. Its use is a form of unlawful coercion.

The Union and its members had the legal right to demand higher wages of complainants, either with or without good reason. The members of the Union also had the legal right to quit work as individuals or collectively, as a means of enforcing their demand. But the Union or its members had no legal right to interfere with the business of complainants or to disturb them in their lawful business or occupation, as was done in this case, for the purpose of compelling them to make agreements with the Union or its members as individuals in regard to the wages to be paid. It must, therefore, be held responsible for the illegal acts in violation of the injunction disclosed by the evidence. It cannot relieve itself from this responsibility by instructing or pretending to instruct its members to be orderly and to obey the law, while it was at the same time engaged in effecting an unlawful end in an unlawful manner. The facts proved by the evidence offered by petitioners overcome and disprove the evidence on behalf of the Union as to such instruction and advice, and as to the ignorance of its officers of what was being done by its members and others. They knew as a matter of fact, and they were bound to know as a matter of law, the natural and inevitable consequences of the illegal conspiracy which the Union and its members had formed and the measures which it and they had adopted to accomplish its object. The Union was the main factor in the conspiracy and by reason of its money and its control of its members it was the real power back of the whole scheme. Under the authorities cited above and many others and the evidence the Union must be held guilty of wilfully violating the injunction, and it must suffer the consequences.

Other questions are presented in the briefs of counsel which we do not deem it necessary to discuss fully. We will indicate briefly our views upon them. It is claimed that substantial injury must be shown before punishment can be inflicted for violating an injunction. Substantial injury is

clearly shown by the evidence. It is urged that the contempt charged herein is criminal. The proceeding was civil and in no sense criminal. O'Brien v. The People, *supra*. We do not regard the punishment inflicted by the court as excessive under the evidence. Counsel for plaintiff in error claim that the court below erred in admitting into the certificate of evidence matter not properly a part thereof. This is not supported by an affidavit even. It rests solely on the assertion of counsel. But the recitals of evidence in the certificate of evidence or bill of exceptions are conclusive upon a reviewing court. Goodwin v. Durham, 56 Ill., 239.

We find no error in the records. The order as to each of the appellants in Nos. 11670, 11671, 11672 and 11673 is affirmed. And in this case No. 11639 the order as to the plaintiff in error is affirmed. Separate judgments will be entered in each case.

*Affirmed.*