FRANKLIN UNION NO. 4*

v.

THE PEOPLE OF THE STATE OF ILLINOIS.

*Opinion filed February 21, 1906—Rehearing denied April 5, 1906.*

1. PLEADING—*want of capacity to sue should be taken advantage of by a demurrer or plea.* Want of capacity in a voluntary association to file a bill in equity should be taken advantage of by demurrer if the defect appears upon the face of the pleadings, or by plea if it does not so appear, otherwise the defect is waived, and the question cannot be first raised in a court of review.

2. INJUNCTION—*defect as to parties does not render injunction void.* Filing a bill for injunction in the name of a voluntary association on behalf of its members, instead of in the names of the members, does not render void the order granting the injunction nor justify violations of the injunction by the defendants.

3. SAME—*error in granting injunction does not justify its violation.* Alleged error in granting an injunction or in making the terms of the injunction broader than the allegations of the bill can not be urged in defense of a proceeding for contempt in violating the injunction, where the court had before it a complainant asking for an injunction and a defendant against whom the injunction was asked, and the bill stated a case falling within the general equitable jurisdiction of the court.

4. SAME—*jurisdiction to grant injunction does not depend upon correctness of the order.* Jurisdiction of a court of equity does not depend upon the correctness of the decision it makes, and such jurisdiction is not lost because the decree is erroneous; and if the defendants in an injunction deem the injunction broader than the bill warrants, they should have it modified instead of ignoring it. (*O'Brien* v. *People,* 216 Ill. 354, followed.)

5. SAME—*corporation may be fined for contempt in violating injunction.* A corporation, other than a municipal corporation, may be punished by fine for contempt in violating an injunction, and the fine may be collected by sequestration of its property. (*Sercomb* v. *Catlin,* 128 Ill. 556, distinguished.)

6. CONSPIRACY—*conspiracy defined.* A conspiracy at common law is an agreement or combination formed between two or more persons to do an unlawful act or to do a lawful act by unlawful means, the *gravamen* of the offense being the combination, which

---

*With this case are decided Nos. 4568, *Smith* v. *People;* 4569, *Kitchel* v. *People;* 4570 and 4571, *Mucher* v. *People.*

may amount to a conspiracy although its object be to do an act which, if done by an individual, might not be unlawful.

7. SAME—*each conspirator is liable for acts. of others.* A conspiracy may be formed by written or verbal agreement or by an undertaking or scheme evidenced by the action of the parties, and when the conspiracy is once entered into, each conspirator becomes liable for all the acts of his co-conspirators done in furtherance of the objects of the conspiracy.

8. LABOR—*when ·a labor union is amenable to an injunction.* Laborers have a right to organize, and they will not be restrained by injunction from leaving the service of their employers even though their action in so doing involves a breach of contract; but when the union and its officers and members agree together to prevent the employers from hiring other persons, by calling a strike and using force, threats, intimidation and picketing, they have entered into an unlawful undertaking, which may be enjoined by a court of chancery.

9. SAME—*a labor union cannot escape consequence of its acts by advising members to obey the law.* A labor union which inaugurates a strike, establishes strikers' headquarters, raises funds, appoints visiting committees, and otherwise directs the strike, is bound, in law, to know of the acts of violence by its members naturally flowing from its course in conducting the strike, and cannot excuse itself from liability upon the ground that its officers had advised the members to be orderly and obey the law.

10. SAME—*intimidation and coercion are unlawful.* One engaged in lawful business has a right to go upon the streets and highways to and from his place of business unmolested and in absolute security, and to follow him, spy after him, stop and threaten him, intimidate or coerce him in an endeavor to induce him to quit his employment are alike unlawful.

11. CONTEMPT—*how contempt may be brought to attention of court.* An alleged contempt committed out of the presence of the court may be brought to the attention of the court by an affidavit setting out the facts, and a petition is unnecessary; but if a petition is filed for that purpose it need not have the particularity of an indictment, and is sufficient if it apprises the defendant of the charge made.

12. SAME—*when order adjudging defendant in contempt is sufficient.* An order in attachment for contempt referring to the petition and the affidavit filed in its support, and in apt terms adjudging the defendant guilty of a violation of the injunction, setting out the manner of its violation, adjudging the defendant to be in contempt and imposing a fine, is sufficient.

13. APPEALS AND ERRORS—*no presumption of error obtains in absence of a complete record.* On appeal from an order adjudging persons to be in contempt, if there is no certificate of the clerk that they have filed a complete record they cannot raise the question that the recitals found in the several orders appealed from are not sufficient upon which to base a judgment of conviction.

SCOTT and BOGGS, JJ., dissenting.

APPEAL from the Branch Appellate Court for the First District;—heard in that court on writ of error to the Superior Court of Cook county; the Hon. JESSE HOLDOM, Judge, presiding.

JOHN A. BLOOMINGSTON, for appellant:

A corporation can only be punished through its officers, or those acting in aid of it, in the absence of legislative enactment to the contrary. *Sercomb* v. *Catlin,* 128 Ill. 556; *Mc-Kim* v. *Odam,* 3 Bland's Ch. 415; *Rex* v. *Wyndham,* 1 Cowp. 377; *In re Marine Ins. Co.* 38 Ill. 289.

The petitions in all the cases were void for want of proper verification. *Oster* v. *People,* 192 Ill. 478.

An order of punishment should be certain. *People* v. *Pirfenbrink,* 96 Ill. 68.

Strike benefits are lawful. *Glass Manf. Co.* v. *Union,* 59 N. J. Eq. 49; *Levy* v. *Rosenstein,* 67 N. Y. Supp. 630.

Guilt in contempt proceedings should be proved beyond a reasonable doubt. *State* v. *Davis,* 40 S. E. Rep. 331; *Accumulator Co.* v. *Electric Co.* 53 Fed. Rep. 793; *Probasco* v. *Probasco,* 30 N. J. Eq. 1; *Sutton* v. *Davis,* 64 N. Y. 633; *In re Bates,* 55 N. H. 325; *Benbow* v. *Kellum,* 52 Minn. 433; *In re Buckley,* 69 Cal. 1; *United States* v. *Jose,* 63 Fed. Rep. 951.

Presumption and intendments will not be indulged in to sustain contempt proceedings. *Hydock* v. *State,* 59 Neb. 296.

The decree must preserve facts in the absence of a certificate of evidence. *Jackson* v. *Sackett,* 146 Ill. 655; *Grob* v. *Cushman,* 45 id. 119.

There is a distinction between violating an injunction and aiding and abetting. *Parsons* v. *People,* 51 Ill. App. 467.

The petition in a contempt proceeding is jurisdictional. *Young* v. *Cannon,* 2 Utah, 560; *Herdman* v. *People,* 54 Neb. 626.

Picketing is lawful. *Glass Co.* v. *Union,* 59 N. J. Eq. 49; *Sherry* v. *Perkins,* 147 Mass. 212; *Vegelahn* v. *Guntner,* 167 id. 92; *Beck* v. *Protective Union,* 77 N. W. Rep. 13; *Wire Co.* v. *Wire Drawers' Union,* 90 Fed. Rep. 608.

TENNEY, COFFEEN, HARDING & WILKERSON, (HORACE KENT TENNEY, and JAMES H. WILKERSON, of counsel,) for the People:

Unless the injunction was void *ab initio* the appellant could not violate it with impunity. The court had jurisdiction and the injunction was therefore not void.

The jurisdiction of the court did not depend upon the sufficiency of the bill, either as to parties or the statement of a cause of action. The bill stated a case cognizable in equity and prayed equitable relief. Whether the case stated entitled the party stating it to relief or not, was not a question which involved the jurisdiction of the court. *Sumner* v. *Milford,* 214 Ill. 388; *O'Brien* v. *People,* 216 id. 354.

A defect of parties complainant, even if it existed, would not deprive the court of jurisdiction. *Keyes* v. *Ellensohn,* 82 Hun, 13; 144 N. Y. 700.

A corporation may be punished for contempt of court. The power of the court is not limited to a personal proceeding against the officer or agent who does or directs the act. 7 Am. & Eng. Ency. of Law, 847; Rapalje on Contempts, secs. 1, 48; Cook on Corp. sec. 15*b;* 2 High on Injunctions, (4th ed.) sec. 1460; *Commonwealth* v. *Proprietors,* 2 Gray, 339; *Commonwealth* v. *Agricultural Ass.* 92 Ky. 201; *United States* v. *Railway Co.* 6 Fed. Rep. 237; *Cary Manf. Co.* v. *Flexible Clasp Co.* 108 id. 875; *In re Tiff,* 11 id. 463; *Water Power Co.* v. *Strawboard Co.* 75 id. 972; *In re North*

*Bloomfield Gravel Land Co. 27* id. 795; *In re Western Ins. Co.* 38 Ill. 289.

The union having joined with its members in a conspiracy to do acts forbidden by the injunction is to be held liable under the rules relating to conspiracy. *O'Brien* v. *People,* 216 Ill. 353; *Coal Co.* v. *People,* 214 id. 421; *Brennan* v. *People,* 15 id. 511; *Spies* v. *People,* 122 id. 1; *Graff* v. *People,* 208 id. 312; *VanEyck* v. *People,* 198 id. 199; *Miller* v. *John,* 208 id. 77; *Lasher* v. *Little,* 202 id. 551; *State* v. *McCahill,* 72 Iowa, 111.

The abstract right to walk the streets or to watch another's place of business or speak to his employees furnishes no justification for forming a combination to induce his employees to leave him, for the purpose of injuring him, so that to escape the injury he will comply with a demand made upon him. It is illegal to boycott a man. *Loewe* v. *Federation of Labor,* 139 Fed. Rep. 71; *Sherry* v. *Perkins,* 147 Mass. 212; *Printing Co.* v. *Cassidy,* 53 Atl. Rep. 230; *Delz* v. *Winfee,* 80 Tex. 400; *Casey* v. *Typographical Union,* 45 Fed. Rep. 135; *Hopkins* v. *Stave Co.* 83 id. 912; *Doremus* v. *Hennessy,* 176 Ill. 608; *Jensen* v. *Cooks' Union,* 81 Pac. Rep. 1069.

Mr. JUSTICE HAND delivered the opinion of the court:

This was a bill in chancery filed in the superior court of Cook county on October 9, 1903, by the Chicago Typothetæ, a voluntary association established for the purpose of advancing and improving the binding and printing business engaged in by its members in the city of Chicago, and for the purpose of employing skilled mechanics whose services might be required by its various members, for and on behalf of R. R. Donnelly & Sons Company, W. F. Hall Printing Company, Marsh & Grant Company, Faithorn Printing Company, Rogers & Co., S. D. Childs & Co., Jefferson Theatre Program Company, Shea, Smith & Co. and A. R. Barnes & Co., mem-

bers of said association, against Franklin Union No. 4, its officers and members, praying that an injunction issue restraining said Franklin Union No. 4, its officers and members, from interfering with the business of the members of said association and their employees and persons seeking employment from them.

The bill averred that Franklin Union No. 4, it officers and members, had entered into a conspiracy between themselves and with other unknown persons to prevent the members of said association from carrying on their business, and to effect the object of said conspiracy said Franklin Union No. 4, its officers and members, had inaugurated a strike, and by a systematic course of force and violence, threats, intimidation and picketing, sought to prevent, and were preventing, persons in the employ of the members of said association from longer continuing in their employment and other persons from entering their employment, the effect of which was to injure and destroy the business of the members of said association. The bill, in scope and character and the relief asked, is substantially the same as the bill filed in *O'Brien* v. *People,* 216 Ill. 354, where many of the questions raised on these appeals are considered and determined adversely to the contention of these appellants.

The defendants were notified of the filing of the bill and the application for an injunction, and on the 10th day of October, 1903, the court issued an injunction restraining Franklin Union No. 4, its officers and the other defendants, among other things, from in any manner interfering with, hindering, obstructing or stopping any of the business of complainants, or their agents or employees, in the operation of their business, or from entering upon the grounds or places where the employees of complainants were at work, for the purpose of interfering with, hindering or obstructing complainants' business in any manner, and also from compelling, or attempting to compel, by threats or intimidation, force or violence, or by unlawful persuasion, any of the employees of

complainants to refuse or fail to do their work or discharge their duties as such employees, or by like methods inducing employees to leave the service of complainants, or by like means preventing persons from freely entering into the service and employment of complainants and continuing therein, and also by like unlawful means compelling and inducing, or attempting to compel or induce, the doing of any act in furtherance of the alleged conspiracy, or to interfere with the complainants or their officers or employees in the free, uninterrupted and unhindered control and direction of their business, or from aiding or assisting any others in so doing, and from congregating upon or about the sidewalks, streets, alleys or approaches adjoining or adjacent to the premises occupied by complainants, for the purpose of intimidating the employees of complainants, or preventing them, or any of them, from rendering their services and discharging their duties to complainants, and also from, either singly or in combination with others, collecting in and about the approaches to the factories and places of business of complainants for the purpose of picketing or patrolling or guarding the streets, avenues, gates and approaches and places of business of the complainants, for the purpose of intimidating, threatening and coercing, or unlawfully persuading, any of the complainants' employees, or of preventing persons seeking employment with them from going to and from the places of business of complainants.

In the bill, as originally framed, the members of the Chicago Typothetæ were named, but not as complainants, the averment of the bill being that it was filed by the Chicago Typothetæ for and on behalf of its members, naming them. The members each, however, signed the following statement in writing, immediately following the verification of the bill: "We, the undersigned, members of complainant association, hereto affix our seals and consent and request that action be brought in court by the filing of the foregoing bill of complaint." On the 18th of October, by leave of court and with-

out prejudice to the injunction, which was expressly extended to cover the amended and supplemental bill, an amended and supplemental bill was filed, in which all of the members of said association named in the original bill, and the C. H. Morgan Company, a member of the association, were formally named as complainants.

The immediate cause of the strike inaugurated by Franklin Union No. 4, and its officers and members, was, that a contract had been entered into between the Chicago Typothetæ, on behalf of its members, and the members of Franklin Union No. 4, regulating the hours, wages and terms of employment between the different members of the Chicago Typothetæ and the members of said union. That contract Franklin Union No. 4, by resolution, on September 27, 1903, annulled. The Chicago Typothetæ and its members thereupon refused to further recognize Franklin Union No. 4 or deal with its members as members of said union. Thereafter, and upon the 5th day of October, 1903, a strike was inaugurated by Franklin Union No. 4 against the members of the Chicago Typothetæ. On October 16 a petition was filed in said cause, which was amended on October 21, representing to the court that John Mucher, Fred Kitchel and Charles Smith had been guilty of a violation of the injunction issued on October 10. A rule was entered to show cause, the respondents were notified and appeared and filed answers, and upon a hearing they were adjudged guilty of contempt of court, and each was sentenced to imprisonment in the county jail of Cook county for a period of thirty days and to pay a fine of $100. On November 2 a second petition was filed against John Mucher, representing to the court that he had, subsequent to his first conviction, again violated the injunction of October 10, and a rule was entered to show cause. He was notified and filed an answer and a hearing was had, and he was adjudged to be in contempt of court and was sentenced to imprisonment in the county jail of Cook county for thirty days. On November 20, 1903, a petition was filed

against Franklin Union No. 4 and Charles F. Woerner and John M. Shea, respectively president and secretary of Franklin Union No. 4, representing that Franklin Union No. 4 and its said officers had repeatedly violated said injunction of October 10. The petition was subsequently dismissed as to Woerner and Shea. Franklin Union No. 4 filed an answer and a hearing was had, and the union was adjudged to be in contempt of court and a fine of $1000 was imposed upon Franklin Union No. 4. Several appeals or writs of error were prosecuted or sued out by said respondents to review said judgments of conviction, to the Appellate Court for the First District, where the cases were heard together and the several judgments of the superior court were affirmed, and several appeals have been prosecuted to this court by said respondents from the judgments of affirmance of the Appellate Court, and upon motion the cases have been submitted in this court upon the same briefs and will be considered together and disposed of in one opinion.

A complete record has been filed in the case of Franklin Union No. 4. A short record, containing a copy of the order adjudging the respondent guilty of contempt of court and imposing sentence upon him, and a copy of the appeal bond, are the only matters contained in the record filed in each of the other cases.

Numerous questions have been raised in the brief filed by appellants, some of which are material to a final disposition of the questions raised upon the records filed in the several cases, and several of which, in the manner in which the records have been framed in the cases other than that of Franklin Union No. 4, are not open to review in this court. As the case of Franklin Union No. 4 involves the main points relied upon as grounds of reversal, and there is a complete record filed in that case, as a matter of convenience we will first consider that case, and then dispose of such questions as are not involved in the decision of that case but which are urged as grounds of reversal in the appeals of the individual

appellants. In those cases, as the records contain no certificate of evidence, no questions of fact are involved.

The first contention made is, that the court was without jurisdiction, by reason of the want of proper parties, to enter the order of October 10 directing the issuance of said injunction, and for that reason, it is urged, the respondents could not be lawfully adjudged guilty of contempt of court for a violation of the injunction. The bill shows upon its face that the Chicago Typothetæ was not an actual or an artificial person, and had the question of its capacity to sue been raised by a demurrer to the bill or by a motion to dissolve the injunction upon the face of the bill, there would have been some force in the position that the bill was defective for want of proper parties. We think, however, the defect in the bill of want of proper parties apparent only and not real, as it appears upon the face of the bill it was filed in the name of the Chicago Typothetæ for and on behalf of the members of that association, naming them, and the individual members of the association ratified and confirmed the action of the association in filing the bill in its name for and on their behalf, by endorsing upon the bill their individual requests and consents that the bill be filed and action be taken thereon by the court,—that is, an injunction for and on their behalf be issued upon the filing of the bill. The want of capacity to file a bill in chancery by an unincorporated body—a voluntary association—must be taken advantage of by demurrer if the lack of capacity to sue appears upon the face of the bill, and if it does not appear upon the face of the bill the question must be raised by plea, otherwise the want of capacity of such association to sue will be waived and the question of its capacity to sue cannot be raised in this court upon appeal for the first time. "With regard to the proper method of objecting to incapacity of plaintiffs to sue in actions by unincorporated associations the usual rules apply, and such objections may be waived or cured in the usual manner. Thus, where the bill, declaration or complaint shows, upon its face,

want of interest or capacity to sue, the proper method of taking advantage of the defect is by demurrer, but where the defect does not thus appear the objection must be raised by plea or answer." (22 Ency. of Pl. & Pr. p. 238.)

In *Ada Street Methodist Episcopal Church* v. *Garnsey,* 66 Ill. 132, suit was begun against that church by the name of "The Ada Street Methodist Episcopal Church" instead of against the trustees of said church, and judgment was rendered in favor of the plaintiff. On appeal to this court it was held a suit would not lie against a church organized under the act of 1845, as such, but that the suit should be brought against the trustees of the church, but it was said, as the question was not raised in the lower court it could not be raised in this court on appeal for the first time. On page 134 the court said: "The defendants are not sued as a corporation, but as a church. As a church they cannot sue or be sued. Actions by or against them must be brought by or against the trustees. The defendants, however, failing to take advantage of this objection in the court below, cannot now avail of it here."

If, however, it were conceded that there was a defect of parties, that fact would not have deprived the court of jurisdiction to have heard and decided the questions before it and its order granting the injunction would not have been void, and the respondents could not have justified their acts in violation of the injunction on the ground that there was a defect of parties to the bill. The appellants do not contend, however, that there was a total incapacity upon the part of the complainant named in the bill to sue, but their real contention is that the injunction granted was broader than the averments of the bill would warrant. They state their own contention in the following manner: "We do not claim a defect in the parties, nor do we urge the incapacity of the parties before the court. We concede that, as far as the Chicago Typothetæ was concerned, the court had plenary powers to act, but having gone outside of the pleadings to

bring in complainants, of its own motion, giving them relief which they did not ask, we believe the court acted without jurisdiction and its order in this behalf was void."

The question thus raised was considered by this court in *O'Brien* v. *People, supra.* On page 363 the court said: "'The chief argument against the jurisdiction of the court is, that the allegations of the bill of complaint are not sufficient to sustain the prayer of the bill and do not set out specific facts which would give the court jurisdiction,—in other words, that the bill would have been obnoxious to a demurrer. It is well settled that jurisdiction does not depend upon the sufficiency of the bill. If the court has jurisdiction of the subject matter and of the parties nothing further is required. The cause of action may be defectively stated, but that does not destroy jurisdiction. A bill may state conclusions, but if not demurred to and the evidence supports a decree conforming to the general allegations of the bill and the decree is within the power of the court to render, the court has jurisdiction. Jurisdiction is the power to hear and determine the subject matter in controversy between the parties to a suit. If the law confers the power to render a judgment or decree, then the court has jurisdiction. (*State of Rhode Island* v. *State of Massachusetts,* 12 Pet. 657; *United States* v. *Anedondo,* 6 id. 709; *Grignon's Lessees* v. *Astor,* 2 How. 338; *Applegate* v. *Lexington Mining Co.* 117 U. S. 267.) Jurisdiction of the particular matter does not mean simple jurisdiction of the particular case then occupying the attention of the court, but jurisdiction of the class of cases to which the particular case belongs. (*State ex rel.* v. *Wolover,* 127 Ind. 306; *Jackson* v. *Smith,* 120 id. 520; *Fields* v. *Maloney,* 78 Mo. 172; *Dowdy* v. *Wamble,* 110 id. 280.) Whether a complaint does or does not state a cause of action is, so far as concerns the question of jurisdiction, of no importance, for if it states a case belonging to a general class over which the authority of the court extends, then jurisdiction attaches and the court has power to

decide whether the pleading is good or bad. (1 Elliott's Gen. Practice, sec. 230; *Hunt* v. *Hunt,* 72 N. Y. 217; *Winningham* v. *Trueblood,* 149 Mo. 572.) Jurisdiction does not depend upon the rightfulness of the decision. It is not lost because of an erroneous decision, however erroneous that decision may be. *Scherer* v. *Superior Court,* 96 Cal. 653; *Young* v. *Lorain,* 11 Ill. 624; *Lane* v. *Bommelman,* 17 id. 95; *Cody* v. *Hough,* 20 id. 43; *Iverson* v. *Loberg,* 26 id. 179; *Feaster* v. *Fleming,* 56 id. 457; *Hobson* v. *Ewan,* 62 id. 146; *Spring* v. *Kane,* 86 id. 580; *Allman* v. *Taylor,* 101 id. 185; *St. Louis and Sandoval Coal Co.* v. *Sandoval Coal Co.* 111 id. 32; *Reid* v. *Morton,* 119 id. 118; *Commercial Nat. Bank* v. *Burch,* 141 id. 519; *State ex rel.* v. *McMahon,* 69 Minn. 265; *People ex rel.* v. *Liscomb,* 60 N. Y. 559."

When a court has before it, as it is conceded the court had in this case, a party complainant asking that an injunction issue, and a party against whom it is asked to issue, upon a bill stating a case falling within its general equitable jurisdiction, the court has jurisdiction to decide whether an injunction should issue or not and the character of the injunction which should issue, and should the court err in ordering an injunction to issue when one ought not to issue, or should it order an injunction broader in its terms than the averments of the bill would justify, its action, on appeal or writ of error, would be set aside; but upon an attachment for contempt, which is in its nature collateral, for a violation of the injunction, a party who has violated the injunction will not be heard to say the injunction ought not to have issued, or was broader in its terms than the bill justified, as an excuse for his action, as the error of the court in granting an injunction or in granting one broader than the averments of the bill will justify does not deprive it of jurisdiction to act, and its order directing the injunction to issue is a valid and binding order until modified or vacated or set aside upon appeal or writ of error.

In *Board of Supervisors of Iowa County* v. *Mineral Point Railroad Co.* 24 Wis. 93, on page 131, the court said: "The force or efficacy of a decree, as between the parties before the court, does not depend upon the fact that there may be other persons, proper or necessary parties, who are not before it. The absence of such persons is not a defect involving the jurisdiction or power of the court over the parties who are present or over the subject matter of the suit, so far as those parties may be concerned. The court may, nevertheless, proceed to a decree, and such decree, though rendered in violation of the rules and practice of equity in such cases, is not void as between the parties to it. It is irregular, but not void. It binds the parties to it until set aside or reversed in some direct proceeding for that purpose. And the reason of this is obvious. Jurisdiction exists whenever there is a suit the subject matter of which is cognizable in a court of chancery, and parties are before the court whose rights in relation to such subject matter the court may adjudicate. And the effect of such adjudication between the parties, until reversed or set aside, does not depend upon the fact that the power of the court may have been erroneously exercised in making it. If there be necessary parties wanting, whose absence may render the adjudication fruitless or ineffectual because the rights of such parties cannot be determined, that may be good cause for arresting the proceedings or dismissing the suit but it does not deprive the court of power to proceed."

The jurisdiction of the court does not depend upon the question of the correctness of its order. Jurisdiction is not lost because the court enters an erroneous decree, however erroneous it may be. *O'Brien* v. *People, supra.*

In *Tolman* v. *Jones,* 114 Ill. 147, the court appointed a receiver of the assets of an insolvent corporation and ordered one of the defendants to the bill to assign and turn over to the receiver certain property. The defendant declined to obey the order on the ground it was broader than the court was

authorized to make under the averments of the bill, and required him to surrender to the receiver property which was not shown to be the property of the insolvent corporation. The defendant was charged to be in, and was punished for, a contempt of court. He prosecuted an appeal, and on page 154 this court said: "If it be the true construction of the order that it required the assignment of other property than property of the corporation or property alleged as belonging to it, then the order in that respect would be too broad, and wrong. But it does not follow that appellant would be justified in disobeying the order for that reason. That would depend upon whether or not the court had jurisdiction. The principle is of universal force that the order or judgment of a court having jurisdiction is to be obeyed, no matter how clearly it may be erroneous. (*People* v. *Sturtevant,* 5 Seld. 263; *Sullivan* v. *Judah,* 4 Paige, 444; *Fennings* v. *Humphrey,* 4 Beav. 1; *Chuch* v. *Cremer,* 2 Phill. Ch. 112; *Richards* v. *West,* 2 Greene's Ch. 456; 2 Barb. Ch. 274.) This has often been held in reference to disobedience to injunctions, as in the cases above, and the principles which govern cases of contempt for a violation of an injunction order are applicable here."

On the 18th of October an amended and supplemental bill was filed which cured all the defects claimed to exist in the original bill. If the original bill was of such character that there could have been some relief of some kind granted under it, then clearly it could have been amended, and if it could be amended it was not a void bill, and the court did not fail, by reason of the want of parties or otherwise, to obtain, by the filing of the bill, jurisdiction of the parties and the subject matter of the suit for the purpose of making the order of October 10. A bill which can be amended is not void. (*Kruse* v. *Wilson,* 79 Ill. 233; *Bassett* v. *Bratton,* 86 id. 152.) The defendants should have applied to the court to modify the injunction, instead of ignoring it, if they were of the opinion it was broader than the averments of the bill

authorized. In *Tolman* v. *Jones, supra,* on page 155, the court points out the proper practice where the order of the court is broader than the averments of the bill will justify. On that page it is said: "The order, * * * at the most, was not wholly void, but only in the particular wherein it is complained of as being too broad. Appellant's proper remedy would have been an application to the court to modify the order in that respect. There was no such application."

We think it is clear, from any view that can be taken of this case, the court had jurisdiction of the parties and of the subject matter of the suit, and that its order of October 10, granting the injunction, was not void, but was a valid and binding order until modified, set aside or reversed, and that the respondents cannot escape punishment for a violation of the injunction issued in pursuance of that order on the ground that the court was without jurisdiction to enter it or exceeded its jurisdiction in entering it.

It is next contended that Franklin Union No. 4 cannot be punished for a violation of said injunction, as it is said a corporation can only be punished through its officers, or those acting in aid of it, for a contempt of court. In former times the rule was held to be substantially in accordance with the contention above made, but that doctrine now seems to have been exploded, as all the modern text writers and adjudicated cases, so far as we have been able to discover, where the question has been fairly presented for consideration or decision, hold that a corporation may be punished for a contempt of court. While by reason of its impersonal nature it cannot be arrested and imprisoned, it may be fined, and the fine collected by sequestration of its property. It is uniformly held that a corporation may be guilty of a crime and punished by a fine, and we have been unable to discover any valid legal reason why it cannot be adjudged guilty of a contempt of court for the willful violation of an injunction and punished by a fine.

High, in his work on Injunctions, (sec. 1460,) says: "A court of equity has jurisdiction to punish a corporation as well as a private person for contempt in violating an injunction." He cites in support of the text, *Mayor* v. *New York and Staten Island Ferry Co.* 64 N. Y. 622. In that case the action of the trial court in imposing a fine upon the defendant railroad company for the violation of an injunction was sustained, and it was in express terms held a defendant corporation would be fined for violating an injunction.

In American and English Encyclopedia of Law (vol. 7, —2d ed.—p. 847,) it is said: "Formerly it was thought that a corporation could not be held liable for contempt, as, by reason of its impersonal nature, it could not be attached. And there are dicta to this effect in some of the late cases. The weight of modern authority, however, is against this doctrine. While a corporation cannot be attached or imprisoned, it may nevertheless be guilty of contempt in disobeying or violating an order or decree of court, as it may be guilty of a tort or crime, and it may be fined therefor and its property sequestered."

In volume 10 of the Cyclopedia of Law and Procedure (p. 1235) the author of the article on Corporations announces the law upon the subject in the following language: "There are early decisions to the effect that a corporation cannot be attached for a contempt of court committed in refusing to obey its order or judgment. This is obvious when it is considered that the corporation is intangible and has no body that can be arrested or taken by attachment or execution, and that the only means of compelling the attendance of a corporation in a court of justice at common law was by a distraint of its lands or goods. But we may easily conclude, both upon principle and modern authority, that a corporation may be punished for those contempts which consist in the disobedience of the judgments, decrees or orders of a court of justice made in a case within its jurisdiction."

Rapalje, in his work on Contempts, (secs. 1, 48,) thus states the general rule: "It is conclusively settled by a long line of decisions that at common law all courts of record have an inherent power to punish contempts committed *in facie curiæ,* such power being essential to the very existence of the court as such, and granted as a necessary incident in establishing a tribunal as a court. And this power extends to the punishment of willful contempts committed by corporate bodies as well as by individuals."

In *In re Western Marine and Fire Ins. Co.* 38 Ill. 289, Mr. Justice LAWRENCE, in discussing the powers of a court of chancery to control a depositary of the court funds, on page 290 said: "When a court makes an order appointing a particular person a depositary of the court funds, and such person, knowing of such order, accepts the deposit, he unquestionably becomes, *pro hac vice,* an officer of the court. The court may order him to refund the money, and if he fails to do so, without showing some valid reason, may proceed against him as for a contempt. The same rule would apply to a corporation, and if its officers having control of its funds, and having the means of payment, belonging to the corporation, in their hands, should refuse to pay, they, too, might be proceeded against as for a contempt."

From a consideration of the authorities and the principles which control courts of chancery in the enforcement of their decrees we are clear that the courts of this State have power to adjudge a corporation, other than a municipal corporation, guilty of contempt for the willful violation of an injunction, and that such corporation may be punished by fine upon being adjudged guilty of a contempt of court.

The case of *Sercomb* v. *Catlin,* 128 Ill. 556, relied upon as sustaining a conclusion different from that at which we have arrived, is not in point. In that case the proceedings were against an officer of the corporation, and what was said in the case with reference to punishing a corporation for contempt of court was not necessary to be said in deciding

the questions then before the court.   And the case of *Hughson* v. *People,* 91 Ill. App. 396, also cited by appellants, was a proceeding against an officer of the corporation, and not against the corporation.   These cases, when properly understood, are not in conflict with the general current of modern authority upon the question now under consideration.

It is further contended that the evidence does not show Franklin Union No. 4 to have been guilty of a violation of said injunction, and that the court erred in adjudging it to be guilty of contempt.   It appears that on the 27th day of September, 1903, a meeting of the members of Franklin Union No. 4 was held at Bricklayers' Hall, in the city of Chicago; that the meeting was called to order by the president of the union; that Gorf, McCabe, Gondeck, Boettger, Mansfield and Kavanagh were appointed as assistant sergeants-at-arms; that four hundred and seventy-eight members out of four hundred and eighty members present voted to adopt the following resolution:

"CHICAGO, *September 27, 1903.*

"At a special meeting of the Franklin Union, held at Bricklayers' Hall, Sunday, September 27, 1903, the following resolutions were unanimously adopted:

"Whereas, on or about January, 1902, a preliminary agreement was presented to Franklin Union by the Chicago Typothetæ, which provided, among other things, that said agreement should become operative when duly signed by the various firms composing the said Chicago Typothetæ; and whereas, this agreement was concurred in by Franklin Union merely as a tentative agreement, with the express understanding that it become operative only with such firms as desired to become parties to the same by making individual agreements with Franklin Union; and whereas, we have waited about two years and have failed to obtain even one of the individual agreements above referred to; and whereas, the Chicago Typothetæ, and the firms composing the same, have evinced unusual carelessness and indifference in this matter and have shown no disposition to perfect the tentative agreement, as aforesaid:

"*Be it therefore resolved,* That. Chicago Franklin Union does hereby declare the aforesaid tentative agreement as null and void.

"*Be it further resolved,* That the Chicago Typothetæ be immediately notified of this action.

"*Fifth*—That in the event the present demand for higher wages terminates in a strike, that no strike benefits be paid for the first week of the strike.

"*Sixth*—That the strike benefit be limited to $5 per week for single men and $7 per week for married men.

"*Seventh*—The levy of a special assessment of $2 a week, the same to continue duing the entire strike, until suspended by act of the union, and to be levied on the entire membership who are employed. Those on a strike to be excused during the term they are on strike, but the assessment to be enforced as soon as they secure work.

"*Eighth*—That suitable headquarters be engaged on the south and west sides for the purpose of transacting the business of the union in regard to the strike.

"*Ninth*—That two committees, of three members each, be appointed to act in the capacity of a visiting committee for the purpose of visiting the various employers; and further, the members of the visiting committee receive the sum of $2.50 per day for each day's time lost.

"*Tenth*—That the scale take effect on and after Monday, October 5, 1903."

—that after the adoption of the resolution, on motion, the president appointed a strike committee, a conference committee and a visiting committee; that Franklin Union No. 4 at that time had a membership of about eighteen hundred; that about two hundred of its members went out on the strike inaugurated October 5; that Franklin Union No. 4 established headquarters, pursuant to the resolution of September 27, at No. 14 Custom House place, which was situated in the vicinity of the business places of the members of the Chicago Typothetæ; that girls and unmaried men, members of the union, received $5 per week, and married men, members of the union, received $7.50 per week each, while on the strike, as strike benefits; that each member of the union not on the strike paid an assessment of $2 per week to Franklin Union No. 4, which was to continue during the strike; that the members out on the strike were excused from paying said assessment while on the strike, but the assessment was to be collected so soon as they were at work; that the strike benefits were paid to the strikers by the secretary of Franklin Union No. 4 at its headquarters at 14 Custom House place;

that when the appellants John Mucher, Fred Kitchel and Charles Smith, and others, all members of Franklin Union No. 4, with the exception of John Mucher, were on trial for having violated said injunction, the president and secretary of Franklin Union No. 4 were present and they were each defended by the regular attorney of the union; that Kavanagh, an assistant sergeant-at-arms of Franklin Union No. 4, was on the picket line and assaulted employees of the members of the association several times; that members of the visiting committee of Franklin Union No. 4 called at the homes of the employees of members of the association and sought to persuade or hire said employees to leave the employment of members of the association; that other employees of the members of the association were taken to the headquarters at 14 Custom House place by members of said Franklin Union No. 4, where they were offered or paid money on condition they would quit the employment of the members of the association; that members of Franklin Union No. 4 followed young women in the employ of members of the association from the buildings where they were employed, to the street or elevated cars, went into the cars, continually watched them, and when the young women left the cars followed them to their homes; that when men or women employees of the members of the association were on the street on their way to and from their homes or places of employment, they were stopped near the union headquarters by members of the union, who by threats and by calling them opprobrious and insulting names sought to force them to leave the employment of members of the association; that more than twenty-five specific assaults were made by members of Franklin Union No. 4 upon employees of the members of the association within a few hundred feet of the door of the headquarters of the union at 14 Custom House place within two weeks of the time the strike was inaugurated; that in several instances men and women in the employ of members of the association, while in the vicinity of the place

of their employment upon the public streets of the city, were knocked down and beaten by members of the union; that persons in the employ of the association were assaulted and beaten by members of Franklin Union No. 4 upon the public streets, while in the vicinity of the headquarters of the union, when on their way to and from their homes, and even while under the escort of a policeman; that members of Franklin Union No. 4, singly, in pairs and in large numbers, congregated on the public streets and in the public alleys near the approaches to the places of business of the members of the association for the purpose of picketing, and when the employees of the members of the association, or persons seeking employment of them, approached the business places of the members of the association, by threats, and often by violence, the members of Franklin Union No. 4, while thus picketing, sought to induce and prevent such persons from remaining in the employ of the members of the association or from accepting employment of the members of the association. The charge in the bill against Franklin Union No. 4, its officers and members, was that said Franklin Union No. 4, its officers and members, had conspired together to do an unlawful act, by agreeing together to prevent the members of said Chicago Typothetæ from carrying on their business, and that in furtherance of said conspiracy they had inaugurated a strike, and by a systematic course of force and violence, threats, intimidation and picketing they sought to prevent, and were preventing, persons in the employ of the members of said association from longer continuing in their employment and other persons from entering their employment.

A conspiracy at common law may be defined, in short, as an agreement or combination formed between two or more persons to do an unlawful act or to do a lawful act by unlawful means. (*Smith* v. *People,* 25 Ill. 9.) The *gravamen* of the offense is the combination, (*People* v. *Sheldon,* 139 N. Y. 251,) and a combination may amount to a conspiracy al-

though its object be to do an act which, if done by an individual, would not be an unlawful act. (*Chicago, Wilmington and Vermilion Coal Co.* v. *People*, 214 Ill. 421.) And the agreement or combination need not be evidenced by a writing. It may be a verbal agreement or undertaking or a scheme evidenced by the action of the parties. (*Harding* v. *American Glucose Co.* 182 Ill. 551.) The law is well settled that when a conspiracy is once entered into, each conspirator then becomes liable for all the acts of his co-conspirators done in furtherance of the objects of the conspiracy. In *Lasher* v. *Littell,* 202 Ill. 551, on page 555, the court said: "The conspiracy being established, everything said, written or done by either of the conspirators in execution or furtherance of the common purpose is deemed to have been said, done or written by everyone of them and may be proved against each." And in *Chicago, Wilmington and Vermilion Coal Co.* v. *People, supra,* on page 452, that "after an unlawful combination is formed, the acts of the different parties to the combination which tend to further its purposes bind all parties to the combination."

It will be readily conceded by all that labor has the right to organize as well as capital, and that the members of Franklin Union No. 4 had the same legal right to organize said union as the members of the Chicago Typothetæ had to form that association, and that the members of Franklin Union No. 4 had the legal right to quit the employment, either singly or in a body, of the members of said association, with or without cause, if they saw fit, without rendering themselves amenable to the charge of conspiracy, and that the courts would not have been authorized to enjoin them from so doing even though their leaving the employment of the members of the association involved a breach of a contract. While such is the law, it is equally true that, upon the members of Franklin Union No. 4, either singly or in a body, leaving the employment of the Chicago Typothetæ, the members of the association had the right to employ other persons in

their places, and when Franklin Union No. 4, its officers and members, agreed together that by calling a strike, and by force, threats, intimidation and picketing, they would prevent the members of said association from employing other persons in their places, then they entered upon an unlawful undertaking, the carrying into effect of which might be enjoined by a court of chancery. In the *O'Brien case,* upon page 373, it was said:· "There can be no doubt that any attempt to coerce the Kellogg Switchboard and Supply Company into signing said agreement by threats to order a strike was unlawful. It was violative of the clear legal right of the company, and was unjust and oppressive as to those who did not belong to the labor organizations. Nevertheless the strike was ordered, and thereafter the plaintiffs in error sought by threats, intimidation and violence to prevent men and women from taking the places of the strikers." And in *Mathews* v. *People,* 202 Ill. 389, on page 401, it was said: "An employer whose workmen have left him and gone upon a strike, particularly when they have done so without any justifiable cause, is entitled to contract with other laborers or workmen to fill the places of those who have left him. Any workman seeking work has a right to make a contract with such an employer to work for him in the place of any one of the men who have left him to go out upon a strike. * * * Liberty includes the right to make and enforce contracts, because the right to make and enforce contracts is included in the right to acquire property. Labor is property. To deprive the laborer and the employer of this right to contract with one another is to violate section 2 of article 2 of the constitution of Illinois, which provides that 'no person shall be deprived of life, liberty or property without due process of law.' It is equally a violation of the fifth and fourteenth amendments of the constitution of the United States, which provide that no person shall be deprived of life, liberty or property without due process of law, and that no State shall deprive any person of life, liberty or property without due process of law,

'nor deny to any person within its jurisdiction the equal protection of the laws.' "

It appears that the strike was inaugurated by Franklin Union No. 4; that it provided a place in which the strikers might congregate near the business places of the members of the Chicago Typothetæ; that it raised a fund by assessing the members of the union that did not go out upon the strike; that said fund was used by it to maintain its members who did go out, while they were engaged in the strike; that its regular committees actively sought to induce persons in the employ of members of the Chicago Typothetæ, or who sought employment from them, not to remain in their employ or not to accept employment from them, and that many of its members were actively engaged in picketing and in the use of force and intimidation against the employees of the members of the association or persons seeking employment from them. It is clear that the violence, force, threats, intimidation and coercion which immediately followed the inauguration of the strike on October 5, in the vicinity of the headquarters of Franklin Union No. 4 and the business places of the members of the Chicago Typothetæ, were the direct result of the action of Franklin Union No. 4 at the meeting of September 27, and of the action of the union and its officers thereafter, and the results which followed were those which Franklin Union No. 4, and its officers, were bound, in law, to know would likely follow their action in inaugurating and carrying on what counsel characterize as an industrial war, and Franklin Union No. 4 having set in motion the force which produced the results pointed out, cannot excuse itself for the part it took in the conspiracy by the statement of its officers that they advised the members of the union to be orderly and to obey the law. The citizen, when engaged in lawful pursuits, must be accorded the right to walk the public streets of our cities and our country highways in absolute security and to go to and return from his home and place of business or employment without being interfered with. To

follow him, to spy after him, to stop him and threaten him, to put him in fear, to intimidate him or to coerce him are alike unlawful. Intimidation and coercion are relative terms. What would put in fear a timid girl or weak woman or man might not terrorize the strong and resolute. All are alike entitled to the protection of the law. *Doremus* v. *Hennessy,* 176 Ill. 608; *Beck* v. *Railway Teamsters' Protective Union,* 118 Mich. 497; *Vegelahn* v. *Guntner,* 167 Mass. 92.

In *Doremus* v. *Hennessy, supra,* on page 614, it was said: "No persons, individually or by combination, have the right to directly or indirectly interfere or disturb another in his lawful business or occupation, or to threaten to do so, for the sake of compelling him to do some act which, in his judgment, his own interest does not require." And: "It is clear that it is unlawful and actionable for one man, from unlawful motives, to interfere with another's trade by fraud or misrepresentation, or by molesting his customers or those who would be customers, or by preventing others from working for him or causing them to leave his employ by fraud or misrepresentation or physical or moral intimidation or persuasion, with an intent to inflict an injury which causes loss."

In *Beck* v. *Railway Teamsters' Protective Union, supra,* on page 520, it was said: "To picket complainants' premises in order to intercept their teamsters or persons going there to trade is unlawful. It, itself, is an act of intimidation and an unwarrantable interference with the right of free trade. The highways and public streets must be free to all for the purposes of trade, commerce and labor. The law protects the buyer, the seller, the merchant, the manufacturer and the laborer in the right to walk the streets unmolested. It is no respecter of persons, and it makes no difference, in effect, whether the picketing is done ten or ten hundred feet away."

And in *Vegelahn* v. *Guntner, supra,* on page 97, it was said: "The patrol was maintained as one of the means of carrying out the defendants' plan, and it was used in combination with social pressure, threats of personal injury or un-

lawful harm, and persuasion to break existing contracts. It was thus one means of intimidation indirectly to the plaintiff, and directly to persons actually employed or seeking to be employed by the plaintiff, and of rendering such employment unpleasant or intolerable to such persons. Such an act is an unlawful interference with the rights both of employer and of employed. An employer has a right to engage all persons who are willing to work for him, at such prices as may be mutually agreed upon; and persons employed or seeking employment have a corresponding right to enter into or remain in the employment of any person or corporation willing to employ them."

The strong arm of the law would be short, indeed, if a member of Franklin Union No. 4, who was guilty of using violence, force, threats and intimidation, can alone be punished, and the corporation—the organized entity—which organized the strike, furnished the money to maintain it, and molded, shaped and conducted it, through its officers, from regular headquarters maintained by it, cannot be reached and punished for the force, violence, threats and intimidation which naturally would, and did, flow from the unlawful acts which it has instigated its members to commit. We think the evidence clear and unequivocal that Franklin Union No. 4 was a party to the conspiracy alleged in the bill to exist, and that it was properly found guilty of a violation of the injunction.

It is further urged that the court erred in reserving for future consideration the question whether the whole or any part of the fine assessed against Franklin Union No. 4, when collected, should be paid to the complainants for their damages and expenses. If the court hereafter should adjudge that said fine, or any part thereof, should be so applied, it will then be time enough for Franklin Union No. 4 to object to its application in that manner. That portion of the order is interlocutory and not now subject to review in this court, and for that reason we express no opinion upon the

question as to the power of the court, after the fine is collected, to direct the payment of the whole or any portion thereof to the complainants in satisfaction of their damages or expenses.

It is next urged that it does not appear that the members of the Chicago Typothetæ have been damaged by the action of Franklin Union No. 4. The bill sets up a state of facts which, if true, conclusively show that if the business of the members of the Chicago Typothetæ was broken up by said Franklin Union No. 4, its officers and members, inducing the employees of the members of said association to abandon their employment and by preventing other persons from entering their employment, the members of said association would suffer irreparable injury. The truthfulness of this averment of the bill cannot be questioned in this proceeding. Nor do we think the fine imposed upon Franklin Union No. 4 of $1000, excessive. The violation of the injunction was flagrant and often repeated, and the imposition of a nominal fine would not have been an adequate punishment of Franklin Union No. 4 or a vindication of the law.

It is also said that the petition upon which Franklin Union No. 4 was adjudged to be guilty of contempt was insufficient. It was not necessary that a petition be filed,—an affidavit would have been sufficient. In the *O'Brien case,* on page 368, the court said, in speaking of the contention that the petition filed against the respondents, and upon which they were adjudged guilty of contempt, was insufficient: "They were not entitled to a specific bill of particulars, nor was it necessary to set out the charge with the same particularity that would be required of an indictment. (1 Bishop on Crim. Proc. sec. 643.) It has often been held that in an attachment proceeding for contempt, alleged to have been committed out of the presence of the court, it should be brought to the attention of the court by an affidavit setting out the particular respects in which the injunction is alleged to have been violated. But that was sufficiently done in this

case.—4 Ency. of Pl. & Pr. 776, 780; *People* v. *Diedrich,* 141 Ill. 665; *Oster* v. *People,* 192 id. 473." The petition filed against Franklin Union No. 4 fully advised it of the charge made against it, and was sufficient.

It is further said the order adjudging Franklin Union No. 4 guilty of contempt was insufficient. The order referred to the petition and the affidavits filed in its support, and in apt terms adjudged Franklin Union No. 4 guilty of a violation of the injunction, setting out the manner of its violation and adjudging it to be in contempt, and imposed upon it a fine of $1000. In *Fischer* v. *Hayes,* 6 Fed. Rep. 63, Mr. Justice Blatchford says (p. 70) : "It is objected that the order of February 17, 1880, decrees only 'that the defendant is adjudged to have committed the contempt alleged,' without reciting farther the offense of which he is guilty. It is insisted that this was necessary, and further, that the order should have recited that the defendant had disobeyed a *lawful* order of the court and was guilty of a contempt of court in so doing. The contempt alleged is set forth with sufficient particularity in the affidavits on which the motion for attachment was founded and in the report of the referee. All the proceedings and the various orders are sufficiently connected together by reference and recital to identify 'the contempt alleged,' without the necessity of reciting at length in the order the particulars of the previous proceedings." We think the order adjudging Franklin Union No. 4 guilty of contempt and assessing the fine against it of $1000 sufficient.

It is next urged on behalf of the appellants John Mucher, Fred Kitchel and Charles Smith, that the evidence not having been preserved by bill of exceptions and incorporated in the records filed in their several appeals, the findings incorporated in the orders adjudging them guilty of contempt were not sufficient upon which to base a sentence. These records contain only copies of the order and appeal bond, and from the clerk's certificate attached to each record we are unable to determine whether the evidence in each case was preserved

by bill of exceptions or not. In *Day* v. *Davis,* 213 Ill. 53, this court held (p. 55) : "While it was not the duty of the plaintiff in error to see that the oral proof was preserved either by a certificate of evidence or by a recital of findings in the decree, it was his duty to bring before us all that is in the record on that point before he can ask us to declare that the chancellor erred in ordering that the property should be sold. If we had a complete record of the cause before us and it should not appear from it that the oral evidence had been preserved, then, unless the decree contained recitals of findings of fact sufficient to sustain the relief granted, the plaintiff in error might insist upon a reversal. In the absence of a complete record no presumption of error obtains, but the presumptions are in favor of regular and correct action on the part of the chancellor." In view of the above holding, the individual appellants, in the absence of a certificate of the clerk that they have filed a complete record, can not raise the question that the recitals found in the several orders appealed from are not sufficient upon which to base a judgment of conviction.

Other grounds of reversal have been urged. They are, however, extremely technical in character and without merit.

Finding no reversible error in the several records involved in the several appeals here considered, the judgments of the Appellate Court in all of said cases will be affirmed.

*Judgments affirmed.*

BOGGS and SCOTT, JJ., dissenting:

We are unable to concur in the reasoning and conclusion of the majority of the court in this cause. Wage earners have a clear right to organize for the purpose of promoting their common welfare, and so long as they seek that end by lawful means they are to be protected. They have likewise the right to strike for the purpose of securing increased compensation, shorter hours of labor or other amelioration of their condition. For the purpose of making the strike effect-

ive and inducing their former employers to comply with their demands they may seek, by persuasion, to induce others to leave, or refrain from entering, the service of their late master.

The employers of the printers had organized an association in Chicago, the Chicago Typothetæ, to enable them to act as an organized body against the workmen, and the law wisely permits the workmen to meet organization with organization, as well as to form organizations for their own purposes in the first instance.

The legislature of our State, the body which makes the law by which courts, as well as the citizens, are to be controlled and governed, has enacted statutes declaring what shall be deemed to be unlawful in the matter of strikes. These statutory enactments are to be enforced by the courts to the end that the provisions thereof shall govern and protect both employer and employee.

The statutory enactments referred to are sections 158, 159 and 160 of the Criminal Code. Section 158 declares it shall be unlawful to combine for the purpose of depriving the owner or possessor of property of its lawful use and management, or of preventing, by threats, suggestions of danger or any unlawful means, any person from being employed by or obtaining employment from any such owner or possessor of property, on such terms as the parties concerned may agree upon. Section 159 declares it to be unlawful to seek to prevent any other person from working or from obtaining work at any lawful business, by threats, intimidation or unlawful interference. Section 160 makes it unlawful for another to enter the coal bank, mine, shaft, manufactory, building or premises of another with intent to commit any injury thereto, or by means of threats, intimidation or riotous or other unlawful doings to cause any person employed therein to leave his employment.

The laboring class has no truer or more powerful friend than public opinion when in its favor, and violations of the

public statutes and laws of the State operate to alienate this friendship and to deprive the laboring man of the sympathy of the public. The sentiment which goes out heartily to the cause of the workmen and is disposed to regard a strike as a laudable effort on the part of men who toil to ameliorate their condition is the honest sentiment of men who love the law and who are friends of peace and good order, and who are rudely shocked and their sympathy and support lost by violence or riotous and unlawful conduct on the part of the strikers. Lawlessness and violence are condemned by all good citizens.

The injunction in this cause restrains the defendants, among other things, from inducing by unlawful persuasion any of the employees of the complainants to leave the service of the complainants, and from attempting to prevent others by unlawful persuasion from freely entering the service or continuing in the service of the complainants. The term "unlawful persuasion" has no established meaning in the law. Appellees contend that all persuasion is unlawful. If such was the view of the chancellor who granted the writ, the word "unlawful" should have been omitted; while if, in his view, there is persuasion of two kinds, namely, lawful and unlawful, the injunction should have more specifically described the persuasion from which the defendants must refrain, so that it would not have been left to each to determine for himself, at his own peril, what was lawful and what was unlawful. The purpose of the injunction is to advise the defendants what particular acts the court has decided they may not lawfully do. It would seem upon reason, however, that when the argument addressed by the striker to a workman for the purpose of inducing him to leave or refrain from entering a certain employment becomes unlawful, it passes from the domain of persuasion into that of coercion, threat or intimidation.

Having this right of persuasion, it was proper for the strikers to exercise it by accosting in a respectful manner

the person whom they desired to address, and they might peaceably, by explanation, argument, entreaty and reason, seek to persuade such person to leave the employment in question, and the strikers might lawfully do this in the public highway or street so long as they did not obstruct public travel, or at the home of the person they sought to interview, or at any other place where they would have a right to talk with that person about any other legitimate business.

In the case of *Doremus* v. *Hennessy,* 176 Ill. 608, there was no question before the court in reference to the right of a striker to induce another to leave or refuse to enter the service of an employer, and what is there said in reference to persuasion is for that reason inapplicable in this cause.

The principle governing such cases as the *Doremus case,* in which interference with contract relations has been held unlawful, stands upon a peculiar ground and does not obtain here.   18 Am. & Eng. Ency. of Law, (2d ed.) 87.

The only case prior to the present one in a court of appellate jurisdiction in this State where the question of persuasion has been squarely before the court was the case of *Beaton* v. *Tarrant,* 102 Ill. App. 124, where the right of striking workmen to use the streets and highways in a manner not inconsistent with public travel, for the purpose of inducing others, by entreaty, argument and peaceable persuasion, in good faith, to leave or refrain from entering the service of the late employer of the strikers is expressly recognized.   To the same effect are the following authorities: 18 Am. & Eng. Ency. of Law, (2d ed.) 87; *American Steel and W. Co.* v. *W. D. Union,* 90 Fed. Rep. 608; *C. G. Manf. Co.* v. *G. B. Ass.* 59 N. J. Eq. 49; *Krebs* v. *Rosenstein,* 66 N. Y. Sup. 42; *Rogers* v. *Evarts,* 17 id. 264; *People* v. *Kostka,* 4 N. Y. Crim. 453; *Master B. Ass.* v. *Damascio,* 63 Pac. Rep. 782; *Reynolds* v. *Everett,* 144 N. Y. 189; *Arthur* v. *Oakes,* 63 Fed. Rep. 310; *United States* v. *Kane,* 23 id. 748; *Union Pacific Railway Co.* v. *Ruef,* 120 id. 102; *Allis-Chalmers Co.* v. *Lodge,* 111 id. 264.   Nor does the fact that the strik-

ers' organization offers to pay the employee whom they desire to have leave the employment for the time he may be out of work render the persuasion wrongful. *C. G. Manf. Co.* v. *G. B. Ass. supra; Rogers* v. *Evarts, supra; Levy* v. *Rosenstein,* 66 N. Y. Sup. 101.

It is urged by appellees, however, that persuasion necessarily and inevitably leads to disagreements, quarrels, force, violence and general disorder, and should therefore be enjoined. Affidavits filed by appellees themselves in this cause show that this statement of fact is not accurate, and their conclusion does not follow. The question is not whether persuasion leads to acts of lawlessness, but whether persuasion, in itself, is unlawful. A man should not be enjoined from doing an act merely because that act may lead to the doing of some wrongful act. If such an argument be followed to its logical conclusion, it would be proper to enjoin the strikers from leaving their homes while the strike continues, because if they are kept at home no violent encounters will take place between them and those who are in the employment in question, while if they are permitted to go upon the streets affrays may occur. The law will be satisfied if the striker be punished when he does a wrongful act. It is not just to punish him for doing an act rightful in itself merely because that act may lead to something wrongful.

Appellees misapprehend the effect of the case of *London Guarantee Co.* v. *Horn,* 206 Ill. 493. The precise question determined in that cause is shown by the conclusion of the court which appears in the opinion on pages 507 and 508. In that case, however, the statement from the opinion in *Quinn* v. *Leathem,* App. Cas. of 1901, p. 495, to the effect that "it is a violation of a legal right to interfere with contractual relations recognized by law, if there be no sufficient justification for the interference," was quoted, and this court said in reference thereto: "We are of opinion that the contention of the appellant in the case at bar, to the effect that competition in trade, employment or business is such a justi-

fication, is in accord with the authorities." In the case now before us, the purpose of the strikers was to rid themselves of competition in employment by causing those who worked in the places they had left, to leave the employment, that the strikers might be re-employed under more favorable conditions than those formerly obtaining.

In our judgment the evidence in this record does not show that Franklin Union No. 4, as a corporation, violated the injunction. The bill charges the defendants with criminal conspiracy against the complainants, and appellees contend that the evidence shows a like conspiracy after the issuance of the writ for the purpose of violating the injunction.

Persons and corporations may combine to bring about lawful results or ends without each being held liable for the unlawful acts of others of the combination, though such unlawful acts were intended by their authors to secure the lawful end desired to be accomplished. That is to say, if the combination is for a lawful purpose to be attained by lawful means, those only who employ unlawful means to bring it about are liable as violators of the law. If the combination is in violation of a law, all are guilty in forming the combination and all are answerable for the unlawful acts of each conspirator.

It being lawful for the union to join in encouraging and inaugurating the strike, it cannot be deemed guilty because of the unlawful criminal acts of others, unless the union aided, counseled or advised the commission of such unlawful acts.

In the recent case of *People* v. *Sullivan,* 218 Ill. 419, it is said (p. 437) : "The rule in Illinois, except as modified by statute in actions of slander or libel, is, that when a criminal offense is charged in the pleadings and must be established either to sustain the cause of action or maintain the defense, the presumption of innocence arises, and the crime charged must be proven by evidence which removes every reasonable doubt of guilt.—*Crandall* v. *Dawson,* 1 Gilm.

556; *McConnel* v. *Delaware Mutual Ins. Co.* 18 Ill. 228; *Harbison* v. *Shook,* 41 id. 141; *Sprague* v. *Dodge,* 48 id. 142; *Germania Fire Ins. Co.* v. *Klewer,* 129 id. 599."

An order punishing Franklin Union No. 4 should not have been entered, therefore, unless the evidence offered was sufficient to establish its guilt beyond a reasonable doubt. The complainants sought to sustain their contention almost entirely by affidavits. Some of these affidavits contained direct and positive averments of wrongs done by certain of the strikers, but many of them contained conclusions of the affiants, statements on information and belief and statements made upon hearsay, so intermingled with such statements of material fact as were found in the affidavits as to make it impossible to separate that which was legitimate evidence from that which should not be considered. *Ex parte* affidavits, such as these, are the weakest and most unsatisfactory evidence. *Pittsburg Appeal,* 79 Pa. St. 317; *State* v. *Mickle,* 70 Pac. Rep. 856; *Fullenweider* v. *Swing,* 30 Kan. 15; *Hat Sweat Manf. Co.* v. *Davis Sewing Machine Co.* 32 Fed. Rep. 401; *Vaughn* v. *Hann,* 6 B. Mon. 338.

In *Becker* v. *Quigg,* 54 Ill. 390, it is said (p. 394) : "One serious objection to the admission of *ex parte* affidavits is, that the opposing party is denied the privilege of cross-examination. This is a most efficacious test for the discovery of truth, and should never be departed from except from actual necessity. A witness subjected to this test cannot easily impose on the court or fabricate falsehood."

Again, such affidavits are frequently in the language of the draughtsman rather than in that of the witness, and for this reason it is impossible to know from the affidavit precisely what the witness intended to say.

In our judgment, in cases of this kind the better practice requires that the defendants be confronted by the witnesses for complainants in open court, where cross-examination may be had, and that the same course be pursued with reference to those witnesses who speak in behalf of defendants.

In addition to the affidavits, it appears from the testimony of John M. Shea, who was financial secretary and treasurer of Franklin Union No. 4, called by the complainants and who was the only witness who testified in open court on their behalf, that the difficulty between the union and the typothetæ originated from the fact that the contract which existed between the members of the Chicago Typothetæ and Franklin Union had not been signed by the members of the typothetæ; that on February 27, 1903, twelve days before the bill herein was filed, Franklin Union held a meeting, (a copy of the minutes of which is set out in the majority opinion herein;) that in fact the union never did call a strike, but that the controversy ensued upon the men being locked out by their employers. Be that as it may, however, it appears from his testimony that strike benefits were paid to the members who were out of work, by virtue of the authority given at the meeting last mentioned; that Shea paid the strike benefits and had disbursed in that way $5000 or $6000, and that persons who had theretofore been tried for contempt of court in violating the injunction had been defended by Mr. Bloomingston, general counsel for the union, but who retained him so to do does not appear. These facts, taken with those portions of the affidavits which can be seen to be material and competent, are not sufficient to warrant the finding of the superior court.

There is no evidence of any corporate action on the part of the union aside from the minutes of the meeting above referred to. There is evidence by affidavits that persons belonging to the union had violated the injunction in a flagrant manner. There is no evidence that the union, as a corporation, approved or acquiesced in any such violations, or that any executive or controlling committee, or other like power in the union, did so. Proceedings were begun against Shea, the secretary and treasurer, and Woerner, the president of Franklin Union, for violation of the injunction. They were included as defendants in the petition filed against Franklin

Union No. 4, which is now under consideration, but the petition as to them was dismissed by the appellees, from which it would appear that no acts done by them were regarded as violative of the writ. The record of the meeting in question does not show that the union did any wrongful act or pursued any wrongful method, or that the union contemplated anything but lawful acts and lawful methods; but even if it were otherwise, it could not be contended that anything done on September 27 afforded evidence of the violation of an injunction issued twelve days later, when it could not be foreseen on September 27 that a bill would be filed or an injunction awarded.

It further appears from the testimony of Woerner and Shea, who are the only persons testifying on the subject, the latter of whom was giving evidence on behalf of the complainants, that the strike committee appointed by the president at the meeting of September 27 never acted, for the reason that the men were locked out before they were prepared to strike.

The strike headquarters was near the establishments of the typothetæ, but in the place which had long been used and which was then being used as the place of business of the union, and consequently had not been selected because it was in the vicinity of the places of business of members of the typothetæ.

Franklin Union No. 4 has 1800 members; but 200 of them were involved in the strike. It would seem that the remaining 1690, at least, should not be punished by a fine inflicted upon the union to which they belong when they have never in any way, by the union or by any executive or other controlling body or officer thereof, countenanced or shown approval of any acts in violation of the writ.

We are also of the opinion that the order, in reserving for determination, after the fine should be collected, the question of paying the amount, or a part thereof, to the complainants for their costs and expenses, was erroneous, first,

because there is no statute in Illinois that affords any warrant for collecting damages and expenses in this way in this suit, and fines for contempt can be so applied only when authorized by statute in cases of this character; and second, because an order punishing for contempt must be specific, certain and final. *People* v. *Pirfenbrink,* 96 Ill. 68; *State* v. *Voss,* 80 Iowa, 467.

The evidence does not show that Franklin Union No. 4, in its corporate capacity, entered into a combination with any other person or persons to do an unlawful act or to do a lawful act by unlawful means or that it did anything in violation of the commands of the writ, and for this reason the judgment as to Franklin Union No. 4 should be reversed.